write down section 922 G8 because it prohibits conduct that is protected by the plain text of the second amendment and because it is inconsistent with this nation's history and tradition of firearms regulation. We think this case can be resolved by the paragraph in the Bruin opinion that's marked with headnotes 14, 15, and 16 that is on page 2131 of the The inquiry will be fairly straightforward. For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the second amendment. Likewise, if earlier generations addressed the societal problem but did so through materially different means, that also could be evidence that a modern regulation is unconstitutional. Your honors, the founding generation was intimately familiar with the scourge of domestic violence. They never addressed that problem through any sort of firearms restriction. They did address the problem through other means, typically societal pressure but also shaming punishments, etc. No disarmament, no bans on the punishment of weapon. Your honor, do you think the analogy that's required, the historical analogy that we have to satisfy, or that I should say the government has to satisfy, has to be specific to domestic violence? Or can it just be a broader category like a dangerous individual's category? Your honor, I'm attempting to follow the Bruin analysis. They said the analogy, the problem that was solved by New York's proper cause law and Heller's, D.C.'s, gun ban was firearm violence in a congested urban community. And so the closest problem that is attempted to address here is domestic violence with firearms. But even if not... We all agree, of course, that we have to follow the Bruin framework. But I think there's still a question that Bruin I think leaves open, tell me if you disagree, which is the level of specificity or generality that we have to strike when it comes to an analogy. I don't know that Bruin tells us a lot about that. And I wouldn't expect it to. It's a new case. It's launching a set of analyses that we should be undertaking going forward. And I understand that, your honor. And it may be that the level of abstraction can be broader than domestic violence. But the government moves out to the highest level of abstraction, which is dangerousness or law abiding or... Well, let's talk about that. Because the reality is, I guess there's a threshold question as to whether Mr. Rahimi is even a law abiding citizen. So is he even covered by the Second Amendment? And I'm looking at Bruin at page 2133, where the court sort of acknowledges that at least, because it's talking about the regulations that burden a law abiding citizen's right to armed self-defense. He's not law abiding, is he? Well, your honor, I don't know how to answer that question because I don't know what law abiding means in this context. I will say that... Well, he got a protective order issued against him by a court of law, right? Because of domestic violence. He did, your honor. And as would anyone covered by this statute, a protective order, a finding at least of a risk of future violence. But in terms of the Second Amendment's coverage, which I understand your question, is he covered by the amendment or not? The Bruin opinion tells us that that question should be answered by the plain text of the Second Amendment. Is the conduct covered by the plain text of the Second Amendment? Yes, it is. The conduct here is the possession, the keeping, and the carrying, the bearing of arms. And the question is who does that right extend to? Well, Heller answers that and Bruin answers that with the people. The people unambiguously means the political community of the United States. So the references in Heller and Bruin to law abiding citizens, that's not really a gloss that we're supposed to follow. I think that it is correct that the Second Amendment protects the rights of law abiding citizens. It may even elevate the rights of law abiding citizens against others. But I think that language comes from Heller, and Heller said the Second Amendment elevates above all other interests the rights of law abiding citizens to use firearms to protect hearth and home. That, I think, is the origin of the phrase here, and we know from Bruin that where that shorthand phrase that the Court used comes into conflict with the plain text of the amendment, the plain text of the amendment wins. So we know when it comes to Bruin that even though Heller said hearth and home, and that was absolutely the language of the Supreme Court that would bind courts otherwise, they said when you're looking to the scope of the amendment, look to the plain text, and the plain text here says the people. So the law abiding is more of a kind of description of how the Second Amendment works. It's not a doctrinal limitation on its reach? I think that's correct, Your Honor, but if you don't agree with me on that, I would submit that Heller... Well, I may or may not agree with you, but I'm not sure it does you much work, right? Because you still have to answer the question, what does the Second Amendment, granted that it applies to all people, how does it protect and against what kind of regulation? So we're back to the nature of this question. So if he's within the coverage, the burden shifts to my opponent to identify laws in the history and tradition of our country's regulation of guns that are sufficiently similar to this one, and they can't. This is a total ban on firearms even in the home. And there's only a couple of those that are referenced in the brief, and they're incredibly dissimilar from this regulation. Mostly, the regulations that are discussed deal with public carry, and the Second Amendment protects that as well, but those other historical examples that limit the ways people use firearms or where they take them are separate from a total ban on the conduct that is protected by the amendment. I think that the New York law was one where the Supreme Court said the founding generation could have enacted a total ban on carrying firearms because they were familiar with urban violence and they didn't. That New York proper cause law was a, the permitting system went back to 1911, and the proper cause specific provision that was being attacked went back to 1913. 922G8 is enacted in 1996. I mean, I can remember that year. My tie is older than 922G8, Your Honors. This is as modern as a regulation can be, and it's unheard of at the time of the founding generation, not because they didn't think domestic violence was a problem, but because they did not see this as necessary to enact. But to go to Judge Wilson and Judge Host's question about law abiding, if that truly were the extent of the Second Amendment, we would expect to find a lot of colonial and colonial-era provisions simply for violating laws. We do not find that, and the government has not cited such provisions. In fact, what we find are there are many laws that were violated that allowed someone to continue to maintain possession of firearms. This was something that was seen as critical to being a citizen at the time. And so, if, and I think that Bruin supports this too, that even on the scope question, we should look to text, history, and tradition for that as well, and the government should be able to point to for instance, fish and game laws, and they had their firearms taken, or violated the prohibitions on breaking the Sabbath, or on, you know, disturbing the peace, and from that all firearms were taken away from the person, there are none of those. In fact, one of the sources cited by the government that we mentioned in the reply brief talks about laws that protected the rights of irresponsible, law-breaking people to maintain their firearms, and that is if you did not pay your debts, if you stole money from the public coffers, you could be, you know, you could have your goods taken away and forfeited, but not your firearms, not the firearms that are necessary to protect the home. Well, your brief didn't address their comment about surety laws, right? I think we did address that, Your Honor, but I'm happy to clear that up right now. Surety laws are entirely different than 922 G.A. In every respect, they were only dealing with subject to the surety law, it was an issue of public carry. They are late in time, they are, you know, 1800s, not at the time of ratification. If you posted a bond, you could continue to carry arms in public. 922 G.A. does not allow that. The surety laws allowed an exception for someone who could show a special need for self-defense. 922 G.A. does not allow that escape hatch or separate provision. And in general, these were extremely short-lived. Nothing like the statutory domestic violence restrictions that have been acted that are much longer. Well, this was a two-year sentence. I mean, two-year ban for domestic. Isn't it possible to get domestic violence orders for just, you know, not bringing your kids back soon enough after they've, you know, a weekend custody or something? I'll say, Your Honor, that this is not my area of expertise, but I have heard complaints from a lot of people that the process associated with these orders is not what we would typically associate. I mean, this fellow is your poster child to maintain this kind of ban, factually. Well, Your Honor. But from the standpoint of domestic violence restraining orders in general, I believe they cover a wide swath of conduct which isn't necessarily violent. They do, Your Honor. And not only that, of course, referencing the allegations about my client's behavior elsewhere, if they are proven in a court of law, he will be punished severely for them. The law prohibits that conduct and he will be punished for them if the state of Texas is able to prove it to a jury's satisfaction beyond a reasonable doubt. So this is not a suggestion that those sort of allegations should be given free reign. In fact, what we're dealing with here are the elements of 922 G-8. And that's why we raise this as a facial challenge, because it is what is prohibited by the statute. That is the violation of the Second Amendment. That there are other facts that might, on a case-by-case basis, make a court say, you know what, this guy, this guy, I'm okay with taking his guns away, but maybe not other people. That's not the way that criminal law works. Does Salerno apply here? Your Honor, Salerno says that a facial challenge is the hardest one to make, and that's in dealing with the Bail Reform Act. I think that Salerno does not have the importance that had been assigned to it historically, and my friend doesn't suggest that it does. I mean, I think it's mentioned twice in the brief. One of the cases that's in their brief, but not ours, is a case called Buckaloo v. Presythe. I may have butchered the pronunciation of the names. It's a death penalty case in 2019. That case says that the Salerno inquiry is just about remedy. It does not change the substantive scope of the constitutional right at issue. And so the question here is, if we win, do you strike down 922g8 entirely, or do you only strike it down as to our client? That's the Salerno inquiry, and I'm saying the answer is you strike it down entirely. Why? Because the only thing that has to be admitted, and the only thing that my client admitted for purposes of this federal proceeding, was that he was subject to such an order, covered by the statute, and that he subsequently possessed firearms in his home, in his bedroom. That is the part that's unconstitutional. This is not a case-by-case inquiry. I am not coming before you saying this one person, you know, is special, or he should be protected. He, of all people, should have the right to bear firearms. That's not my point. But there might need to be more elements for this to survive scrutiny. Exactly. There were no other elements. Exactly, Your Honor. If the government, for instance, wanted to say that this man in particular can be prohibited because of X, Y, Z. There was a conviction. The conviction required certain dangerousness elements, et cetera. Exactly. X, Y, Z should be in the federal statute, and it's not. So this was, a challenge was brought originally as a motion to dismiss the indictment, where the court is required to assume that the allegations of the indictment are true, but beyond that, there are no more facts to put forward because that's just the stage that we were at. Now, it so happens that under the pre-Bruin analysis, this statute was considered constitutional. He did plead guilty. And then some of the facts that were found for purposes of sentencing, I think, are what are being referenced here. But we say the statute on its face is unconstitutional because it burdens. It, in fact, prohibits the very same conduct that is protected by the Second Amendment because it applies to the people, and that means the members of the American political community, and it is inconsistent with the history and tradition of firearms regulation in the United States. I think that one other thing to mention that the government said in its response was that this idea of the background checks, Bruin says a background check is okay. We're not, you know, suggesting that Bruin, that background checks are unconstitutional. And the government says background checks look to see if you have a domestic violence restraining order. I think that's almost putting the cart before the horse. Background checks are acceptable as an enforcement mechanism for substantive law. They do not settle the question of whether the substantive prohibitions themselves are. What's that got to do with this case? I'm sorry? What has it got to do with this case? It's just one of the arguments that the government raised was that, you know, that background checks are okay, so these must be okay. I'd also say that historically that's similar to a muster. I mean, the, you know, the committees of safety could call all of the people, you know, who had firearms to bring them in, you know, get a count of them, know which guns are out there. That's separate from the question of whether guns could be entirely taken away. What do you make of the 1662 Militia Act that the government cites in its supplemental? I think the most important thing when looking to history is to distinguish between the laws that should be assumed to be part of the public understanding of the right protected by the Second Amendment and the laws that the Second Amendment was designed to correct against. I think that... If the 1662 Act is a relevant historical analog, then that supports 1922G. Your point is this should not be considered a part of our history. Is that sort of where we're going here? I guess I'm not as intimately familiar with the pre-colonial historical precedent. I will say that the founders had a ready-made alternative if they wanted to enact a Second Amendment that was subject to congressional limitation. That was the English Bill of Rights, which is to say, you know, according to law, Protestants, you know, according to their station. Rather than enact that, they chose to enact an unconditional protection. And so in that sense, I would say that... Right, but Bruin tells us to understand what the scope of the right is, we look to historical analogs, and I see the 1662 Militia Act saying that law enforcement agents can judge people to be dangerous and essentially, I think, to disarm them. So I'm wondering if that's correct and if so, what that says for our case. I think that... I see my time's expired. That is the sort of logic that the governor of Massachusetts used to disarm the people ahead of Concord and Lexington. In other words, in England, yes. But 1662 during the reign of Cromwell? I'm going to have to get back to you on reply, Your Honor. I don't have my British history nearly as well as you and Judge Ho would. Close to hand. I know that when there was a restoration of the law... Your Honor, this is on the government's brief. I'm not springing on this. Right. No, no, no. And I don't mean to suggest that. I'm just... I didn't make this up. Perfect. Like I said, hopefully I'll have a better response in reply, Your Honor. Thank you. All righty. Thank you. Mr. Glaser. May it please the Court. William Glaser for the United States. I'd like to start with the language in Heller and Bruin talking about the meaning of the Second Amendment, that it is... that it protects the right of responsible, law-abiding citizens. Now, Mr. Wright contends that the only relevant question is whether his client is part of the people and was bearing arms. But I think Heller and Bruin were actually construing the text in light of history when they added that limitation of responsible and law-abiding. That is part of what the Second Amendment means. Now, obviously, history is very important in understanding the Second Amendment. Right. The Second Amendment codified a pre-existing historical right that existed in England and was brought through the colonies. So when understanding... So your view is, if you're not law-abiding, whatever that means, we can discuss that. If you're not law-abiding, you are outside the Second Amendment in total? Yes, Your Honor. What about the First Amendment? Your Honor, the First Amendment is going to implicate, obviously, different concerns. Same words. The constitutional text is... I don't need to read it to you. You know it's the same words. Sure. Your Honor, I think the reason that the First Amendment is different is because of the historical context of the right to bear arms. So, again, Heller said this was a pre-existing right. Heller said that it was adopted based in large part on the English Bill of Rights, which had limitations built in to the scope of the right. So I think the First Amendment is different in that the right that it recognized, assuming that was also a pre-existing right, the right that it recognized was defined differently at the time of the amendment. I acknowledge that how you understand the scope of the freedom can vary, will vary, based on what the underlying freedom is and its history and tradition. But I think you're making a broader point, which is, if you are not law-abiding, you are categorically, textually outside of the Second Amendment. You didn't say that. Or are you saying that? Well, I'm not sure that I'm going quite that far, Your Honor, and the reason is that the whole inquiry, so whether you look at it as sort of the scope of the right or historical analogs, the whole inquiry is whether or not your conduct is something that falls within the right, not necessarily the person. So we're not arguing, for example, that Mr. Rahimi falls outside the people. What's your bottom line? Your Honor, the bottom line is that Heller and Bruin have already said that the right protects the right of, the Second Amendment protects the right of law-abiding, responsible citizens. Mr. Rahimi is not one of them. But even if this Court were to assume that he was one of them, and that he had sort of had the full... Are you basing that on the mere existence of a domestic restraint order? I'm not going to call it a domestic violence order, because you can have restraint orders like no contact just because you're verbally harassing your ex, right? Well, Your Honor, the restraint order does have to satisfy G-8. So it can't just be any state protective order. Under 922 G-8, it has to be an order that either includes a finding that the person represents a credible threat to the physical safety of their intimate partner or child, or explicitly prohibits the use of, attempted use or threatened use of physical force. And this Court held in Emerson, and that requires, quote, a real threat or danger of injury. So it does actually, to satisfy G-8, it can't just be sort of any state restraint order. But couldn't law-abiding mean you've been convicted of a felony? Your Honor, it's... In other words, does the reference to law-abiding just mean that the people who don't have criminal records that are otherwise disqualifying? I mean... Sure. Your Honor, it certainly does mean that. Our argument is that it means more than that. But is that all it means? I mean, how do we put a book end on the other side of that? Tax evasion. Right. So I think the... I would assume that tax evaders are armed. Your Honor, if it violates a criminal prohibition, then I think that that person would not be law-abiding. But I think... Feeding? Your Honor, no. And I think the answer to all these questions goes to history. So unfortunately, they're not sort of two clean, separate analyses. In other words, the scope of the right and the scope of what law-abiding means does look to history. Heller looks to history. Bruin looks to history. There weren't evaders in colonial times. Your Honor, I don't believe there were. No. And so I'd love to turn to the history because I think that is where we can sort of see what law-abiding means and whether or not we're looking for distinct historical analogues or sort of looking for more generally the scope of the right. The history is a good place to start. So the history in England was clear. The Militia Act that Judge Ho referenced allowed constables to arrest anyone who rode armed offensively to the terror of the people. Bruin said that that was a common law offense that carried over into the colonies in the United States. And actually, in fact, there were four colonies or states that by 1791 had specifically adopted statutes to similar effect, authorizing arrest of those who went armed offensively. And two of those statutes specifically referred to threatening, making menaces or threatening speeches. So those states or colonies were North Carolina, Virginia, Massachusetts, and New Hampshire. In addition to those states, there was a little bit of overlap here, but there were six states, including two of those states I just mentioned, that adopted explicit surety statutes. This is all before the Second Amendment. We cite some of these in our brief. Bruin cites some of these statutes as the sort of armed offensively statutes, but they also included surety provisions. In other words, you can... I got to tell you, I don't really understand the surety argument, because that's a bond requirement. It's not a ban. How does that help you? Your Honor, so it is true that the surety requirement by itself is not a ban, but in fact, three of the statutes that I just referenced, two of which had a surety provision, actually required forfeiture of the weapons. So those were Virginia, Massachusetts, and New Hampshire. Those were colonial statutes. We're not talking about the 19th century statutes that Mr. Wright discussed in his reply brief, but those statutes actually allowed forfeiture. So three states specifically allowed forfeiture of the firearms. I think additionally, though, beyond that... Remind me, based on what? What's the trigger? So in Virginia, Your Honor... Is there a carry issue, or is there dangerousness involved? It's certainly dangerousness, Your Honor. So in Virginia, it was... It's not the surety part of it. You're using that as a term, but it's... That's correct, Your Honor. There's a ban part of the surety. That's correct, Your Honor. So the surety part, though, I think is still relevant, and the reason why is that the surety laws allowed a person, actually required a person to be arrested in some states, in other states, they would just be brought before the justice of the peace, not necessarily in custody, based upon threats that they made to another person. And if they were unable to satisfy the justice of the peace with sufficient sureties or guarantees of good behavior, they would be put in prison until the next term of court. So they were not allowed any freedom at all. And so I think that that's extremely relevant when looking at the 922G8 and the limitation on those subjects to protective orders. That those people are allowed their freedom, that is, they're not under arrest, and they're not actually placed on bail. They don't have to pay money or obtain other people guaranteeing their good behavior, but they're not allowed to possess weapons during that time. So are they exactly identical to the protective orders under G8? No. But they are relevant analogs, especially, I think, against the background of the historical laws allowing disarmament of those who are dangerous. That was for misuse of the firearm to begin with. Your Honor, yes, although two of those statutes seem to include simply threatening speeches that don't necessarily require that the firearm be brandished or used offensively in any sense. Does this have something to do with outlying duels? Your Honor, there were separate dueling laws. None of the provisions that we cite and rely on overlapped with the dueling provisions. How much research has been done on these surety laws? Your Honor, I've done more than I... more in the last few weeks than I ever anticipated doing. Honestly, the law review articles have not dug into them extensively. So, in fact, Bruin didn't have all of the colonial surety laws at hand and only discussed the 19th century surety laws. But I have researched them. I think the numbers that I'm citing to you today sort of cover the colonial period at least. I'm happy to provide additional citations to the court in a 28-J if you'd like. But unfortunately, there is not extensive research into the entire scope of the colonial surety laws. To address the Mr. Wright's contention that colonial laws actually protected the rights of those who violated the law, this is at the end of his supplemental reply brief citing the Greenlee article that the government also cites. But if you look at the statutes that were at issue there, they prohibited someone from seizing someone's firearms as part of a civil suit or in order to recover taxes. In fact, one of the statutes, the Federal Malicious Act that is cited, only applied to militia arms, which were, although personal arms, would also be provided to the poor if they were unable to acquire their own. So those laws that protected the firearm rights of people who Mr. Wright labels as non-law-abiding were actually more limited in that they only protected those firearms from civil suits, from seizure based on tax purposes, and did not sort of protect them as a general matter if they were using those firearms in a dangerous way or were otherwise threatening to other people. In fact, one of those states cited is Virginia, which, as I already said, was one of the states that prohibited going armed offensively to the terror of the country and allowed seizure of firearms if someone did so. So, unfortunately, the history here can be sort of complicated when you really dig into it, but if you zoom back out, there's sort of three different movements, if you will, that establish that the firearms regulation, that 922G8, is consistent with the historical firearms regulation. The first of those is the English common law, which, as we spoke about earlier, the Militia Act allowed constables to seize the arms of those who went armed offensively. The English Bill of Rights was a limited right, which Heller said was actually the precursor to the Second Amendment, in that the English Bill of Rights said that Protestants may have arms for their defense suitable to their conditions and as allowed by law. So, again, when Heller was interpreting the historical scope of the Second Amendment right, it recognized that it was a limited right. It's not an unlimited right for every person to bear any arm in whatever manner. So we have the English law, which is instructive. We also have the debates surrounding the adoption of the Second Amendment, which, as we addressed in our brief, several of what Heller termed the Second Amendment precursors similarly had limitations for those who were not law-abiding or not peaceable. Now, those were not ultimately adopted in the Second Amendment, as Mr. Wright points out, but this is different than a question of statutory interpretation, where if a legislature chooses not to include certain limitations, then clearly it did not mean them, because, as Heller explained, the Second Amendment was recognizing a pre-existing historical right. And so Heller itself looked at those proposals from the ratifying conventions as being helpful for understanding how everyone at the time understood the scope of the right. And then I think the third movement, if you will, is these colonial laws. They were carried forward certainly into the 19th century surety laws that Bruin discussed and that Mr. Wright has discussed. But those laws carried on the English tradition of disarming those who were dangerous, who went armed offensively to the terror of the people, and also allowed specific people who feared for their own safety to obtain sureties of good behavior or the person against whom they sought them could be locked up. That's analogous in many... Did you square any of that with your overarching law abiding? Your Honor, the way that I think... In other words, I think Judge Wilson mentioned tax evasion and you said, yeah, they could be disarmed. Your Honor, in the case of tax evasion, because that's not a dangerous offense, then it might be someone who actually had to be convicted, in other words, be a felon, before they could be disarmed. So you say any felon can be disarmed. So you're covering the entire scope of 922. Yes, Your Honor. Our view is that 922 G1, the separate provision, is still constitutional after Bruin. Obviously we haven't briefed that because that's not an issue here, but the government's view is that any felon, regardless of whether they're dangerous, can have their firearm rights taken away. And in fact, Heller and Bruin indicated as much in saying that... They didn't. Well, Your Honor, they said that they were not calling such laws into question. They certainly didn't. They did not even say that about felons in general. Your Honor, I believe... They wouldn't have because that was not the facts before them and they were...Heller said there could be regulations and I think, if I recall, and I haven't reviewed Justice Scalia's opinion lately, he was talking about mentally ill people, among others, but I don't think he used the word felon, meaning anybody who dumped waste into a river, for instance. Well, Your Honor, perhaps I'm misrecalling the opinion in Heller. I believe it does refer to felons, but I think regardless... I have a slightly different take on the language because I have it. Nothing in our opinion... Let me rephrase. Nothing in our opinion should be taken to cast doubt on long-standing prohibitions on the possession of firearms by felons and the mentally ill. So I take your point that the Court is talking about felons, but all it's really saying, I think, is that's reserved for another day. We're not talking about that today. Nothing in our opinion is doing this. Your Honor, I think that's correct. I think that's fair, Your Honor, although I do think the Supreme Court's statement there should carry weight with this Court. But even this Court obviously doesn't need to decide it today because this Court is not today facing a 922g1 challenge, although you will be. But the question before the Court today is whether 922g8 is constitutional as applied to someone who is clearly, on the facts of this case, dangerous. You do say on the facts of this case, and again, it's a week or two since I read the violence order here, but we know what the circumstances were behind that. And that's where he threatened his ex in the parking lot, right? Yes, Your Honor. But he didn't discharge a gun at that time, did he? He shot it into the air. Your Honor, at that time, he did discharge a gun. I believe the facts indicate it was in the direction of someone who witnessed the event, but I'm not sure if it was at the person or just generally in that person's direction. But I think the facts of this case matter because this is a facial challenge that Mr. Rahimi has raised. And it's his burden on a facial challenge to show that there are no constitutional applications of 922g8. Frankly, Bruin itself was a facial challenge. And it's very hard for me to envision how you could have as-applied challenges to felony statutes like this. Your Honor, I agree. I don't think as-applied challenges would be appropriate either. And I think part of the reason for that is that the protective order here can itself be challenged. In other words, as the Supreme Court discussed in the Lewis case involving a felony conviction that was obtained in violation of the right to counsel, the way to deal with that problem is to challenge the underlying felony conviction. And by analogy here, the way to deal with the problem would be to challenge the underlying... How would that work? Let's just stipulate, just to understand the underlying procedure. If we stipulate that this is an unconstitutional statute, how do you get at that through challenging the underlying order? Oh, I'm sorry, Your Honor. Maybe I misunderstood your point. That wasn't exactly my point. I was addressing whether or not there could be as-applied challenges to a prohibition like 922g8 or 922g1. And I don't think that there can be. There's some dispute among the circuits on that issue. But here, all we have is a facial challenge. Mr. Ramey has not raised an as-applied challenge, and so he needs to show that the statute is unconstitutional in all of its applications. So you could perhaps come up with scenarios where 922g8 would be satisfied by finding a credible threat in a situation where the person was fully law-abiding was not actually a credible threat, but that's not this case. And certainly, under the language of the statute that requires a credible threat, the government's view is that it's constitutional in all of its applications. But at the very least, Mr. Ramey can't show that it's unconstitutional in all of its applications. But the individual challenge would basically be a collateral attack on the domestic violence order. Your Honor, I think that's correct. Well, the government would argue vociferously against that, wouldn't it? Yes, Your Honor, we would. We would argue that the right way to deal with that problem would be to seek to have the protective order removed. Any other questions? Thank you, Your Honor. If time permits, Your Honor, I'd like to address the last point, Salerno, the order of the English predecessors, and then law-abiding. On Salerno, I may not have answered the question as clearly as I wanted to during the earlier argument. Bruin was a facial challenge. By the government's logic, there are some constitutional applications of New York's licensing law. Heller, facial challenge, struck down. Johnson v. United States, I know that's vagueness in a sentencing law. Certainly, there are constitutional applications of the residual clause of the Armed Career Criminal Act. The whole thing is struck down. That aspect of Salerno, kind of the recently historical view the courts took of, if any way to apply this statute would survive constitutional scrutiny, if you lose, that's gone. The Buccaloo point, I think, makes that clear. Salerno is bad law, or at least bad law in this context. Buccaloo says it is a remedial question. Do we strike down the whole law, or do we strike it down only as to my client? Is the difference between facial and as applied not the substantive scope of the law? I'm happy with either one of those. I think, Judge Jones, you're right that the 1662 Militia Act would have been when Cromwell was in power, because I know in 1689 the English Declaration of Rights that I mentioned meant to correct against some of the abuses of that as sort of a condition of restoring the monarchy. There were protections for an Englishman's right to bear arms. But that is relevant to consider the meaning of the right to bear arms that was preserved in our Second Amendment. My main contention to you about the English predecessors is you should not use the parts that we got rid of to say what the parts that we kept mean. The Supreme Court cites the 1662 law. Yes, for purposes of getting at the parts of it that we kept. It is an individual right, for instance, and not a collective right, not a militia right. That part we kept. That part is correct. What's your best evidence that that was part of the English history that was rejected by the time of our founding and therefore rejected for purposes of the Second Amendment? I think our reply brief goes through the process of getting to the Second Amendment. There were some early predecessors that suggested a more limited right along the lines that the government suggested. Those didn't even get a majority of the delegates who were at the ratifying conditions where they were proposed. The majority votes for Second Amendments were unlimited. They did not say according to law. So we had an example of a right to bear arms that could be restricted when the legislature decided you were dangerous or untrustworthy. We did not want that because our history with that government was they would always take more than you gave them. It would always go too far and the political process alone was not enough of a protection. So we adopted instead the unconditional right in the Second Amendment. Compare the Second Amendment to the 1689 bill and I think the things that we didn't keep are parts that we didn't want. And for that reason, it's an unconditional right. It is all of the people. It is not just Protestants. It is not people according to their station. And it is an unconditional guarantee. It is not according to law, which was the English predecessor. I think in that sense, it is relevant to how people understood the scope of the right that we kept but not to the limitations on law abiding. It may be like felon that the Supreme Court was observing for another day the question of what sorts of violations of law would be permissible. You could deny the Second Amendment right or it may be, as Judge Wilson said, if felons are sort of exempted or some felons or violent felons then it may have been a shorthand way of saying not felons. I do know that when they gave instructions for what to do on the scope of the right, they said go to the plain text. And the plain text is the people and Heller says it means the same thing in the First Amendment, the Second Amendment, the Ninth and Tenth Amendment wherever it appears it means the same thing. What do you make of the government's argument that 922G8 is sufficiently cabined in, in response to your concern through the fact that there has to be certain findings of dangerousness? It's inconsistent with the history and tradition. What would it take to make 922G8 constitutional? What elements does Congress need to add in your view? If it were a bond requirement, if it were limited for instance if it were a time, place and manner restriction so if it said you cannot violate the geographic restrictions of a protective order and possess a firearm within 1,000 yards of the victim that would probably be constitutional because that could be... There's no prohibition that would be constitutional in your view with respect to domestic violence findings. I think that's right, Your Honor. It's a tougher question with convictions, I agree. You can say you can't approach your spouse you can say things like that but there's no way you can disarm somebody based on a... What about conviction? I want to say disarm to be clear is not just take the guns away or forfeit the guns because that did happen but it was not a prohibition on then going back to your home and possessing a separate firearm at your house. That's what's so rare about this. We could be across the country from each other and I gave up my right to contest the protective order in a different time zone I am still prohibited from having a firearm in my bedroom so in that sense there's nothing like that in the colonial period. There's no time limitation, there's no place limitation this is just a total ban. Okay, thank you very much. Very interesting. As Mr. Glazer said, the first of many.